UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division – In Admiralty

In the Matter of the Complaint of
Jackson Creek Marine, LLC, as Owner of
the TUG JACQUELINE A

Civil Action No. 2:16cv98

## REPORT AND RECOMMENDATION

This Report considers crossclaims for indemnity arising from a civil action filed by a tug mate, Brett Wayman ("Wayman"), who was injured when a concrete mooring caisson collapsed during undocking maneuvers at the Perdue Grain Facility ("Perdue") on the Elizabeth River in Chesapeake, Virginia. The tug owner, Jackson Creek Marine, LLC ("Jackson Creek"), filed this limitation action to defend Wayman's claims against it and Perdue filed crossclaims for indemnity. After settling with Wayman, Jackson Creek moved for summary judgment on the crossclaims arguing that Perdue's claims for contribution were barred by maritime precedent governing proportionate liability, and its claims for indemnity failed as a matter of law. Perdue agrees that its contribution claims are barred, but argues the indemnity crossclaims should survive summary judgment as disputes of material fact preclude the court from finding Jackson Creek was not negligent. This Report concludes that Wayman's claims against Perdue arise out of Perdue's own alleged negligence, and as a result, it cannot be held liable to Wayman for Jackson Creek's conduct under the claims Wayman asserted. Because the company seeks only indemnity for amounts it would have to pay Wayman for Jackson Creek's negligence, and a court finding against Perdue can only be the result of its own negligence, the company has no

1

claim for indemnity and the disputed issues of fact do not preclude summary judgment in favor of Jackson Creek.

## I.  FACTUAL AND PROCEDUARL HISTORY

Wayman was employed as a mate on the tug JACQUELINE A, which is owned by the Limitation Plaintiff, Jackson Creek Marine, LLC. Jackson Creek is owned by John E. "Jay" Ward, and operates the JACQUELINE A under the terms of a written Towage Agreement with Perdue. Jackson Creek is almost exclusively engaged in delivering barges to and from Perdue's Chesapeake Grain Facility on the Elizabeth River.

On November 5, 2014, the JACQUELINE A delivered a barge owned by Dann Marine Towing, LC ("Dann Marine") to a grain barge dock which is part of Perdue's Chesapeake facility. The Perdue physical plant on the Elizabeth River includes shore-side grain operations, as well as a vessel terminal where ships and barges deliver grain products. After releasing the delivered barge, the captain of the JACQUELINE A, Michael Bohanon, noticed that the barge's mooring lines were piled on top of a concrete capped mooring caisson, which was part of Perdue's Chesapeake facility. The mooring caisson[1] consisted of several twelve-inch-diameter concrete-filled pipes crowned by a six foot thick concrete cap approximately thirty feet in diameter. The caisson was connected to the shore-side bulkhead by an aluminum gangway, and protected on the river side by a wooden fendering system extending from the grain pier.

Captain Bohanon ordered his crew to retrieve the lines from the caisson, and maneuvered the JACQUELINE A bow-first up to the fendering system adjacent to the caisson. Wayman climbed onto the fendering, stepped across it, and onto the caisson which immediately collapsed sending Wayman into the river and causing his injuries. The tug's approach, Wayman's

---

[1] This Report refers to the structure as a "mooring caisson," adopting the description used by Wayman in his original Complaint. (ECF No. 1-1, at ¶ 10). The witnesses and parties also refer to it as a "dolphin," or "piling cluster."

deboarding, and the caisson's collapse were all captured on security camera video which is part of the summary judgment record. Mot. for Summ. J., Exhibit G (ECF No. 43). As a result, the foregoing description is not materially in dispute.[2]

Accepting the facts in the light most favorable to Perdue, the nonmoving party, the following additional findings from the record underlie Perdue's crossclaims and are relevant to the summary judgment analysis. At the time of his fall, Wayman was not wearing a personal floatation device ("PFD"). In addition, the aluminum gangway leading to the mooring caisson was available to crew members, including Wayman, but Captain Bohanon elected to place Wayman on the caisson directly from the JACQUELINE A and the adjacent fender rather than utilizing the gangway. Finally, the parties sharply dispute whether anyone at Jackson Creek had notice that the caisson was in poor condition. But accepting the summary judgment evidence in the light most favorable to Perdue, a reasonable juror could conclude that Jay Ward, Jackson Creek's owner, was "not shocked," that the caisson fell; that he was aware that the Perdue facilities generally were in poor condition; and that an employee had previously told him the caisson itself was a "ticking time bomb." Wayman did not allege that Jackson Creek had actual knowledge of its condition.

Wayman filed suit against Perdue and Jackson Creek in Portsmouth Circuit Court (State Compl. (ECF No. 1-1)) and following this limitation action, he also filed a claim against the JACQUELINE A and crossclaim against Perdue in these proceedings. Specifically, Wayman asserts that Perdue is liable for failing to maintain the mooring caisson, failing to warn him and

---

[2] Despite the clarity of video, which shows the tug inching up to the fender, and Wayman stepping onto the fender before reaching the mooring caisson, Perdue has proffered an expert "interpretation" of the video tape suggesting that the tug pushed the mooring caisson over during its approach. Austin Report (ECF No. 46-3, at 3) ("I do not believe he pushed heavily against the concrete cap but it was enough to cause the dolphin to fall over"). But the speed of the approach, the tug's minimal contact with the fender, and the timing of the caisson's collapse persuade the court that no reasonable juror could conclude a properly maintained mooring caisson would have collapsed under these circumstances.

others of its defects, and allowing its continued use despite actual or constructive knowledge of its deteriorated condition. Wayman Crossclaim ¶¶ 14-18 (ECF No. 22). Wayman also asserted liability against Jackson Creek, arguing the company was negligent in failing to discover the defective condition of the mooring caisson, and failing to warn him of its unsafe condition. Wayman also asserted that Perdue's negligence was imputable to his employer. Id. at ¶¶ 24-25.

Perdue filed a crossclaim for indemnity against Jackson Creek asserting three counts. Count I, styled "Implied Contractual Indemnity," alleged that Jackson Creek breached its implied warranty of workmanlike service in performing towing services under the Towing Agreement between the two companies. Count II, styled "Tort Indemnity," alleged that Wayman's injuries were entirely the fault of Jackson Creek's negligence and sought indemnity "in the event Perdue is found liable for the injuries sustained by Wayman." Perdue Crossclaim ¶ 21 (ECF No. 18). The third count sought contribution from Jackson Creek in the event that both Perdue and Jackson Creek were found liable as joint tortfeasors. Id. at ¶¶ 22-26.

After discovery, Wayman settled his claims against Jackson Creek and they were dismissed with prejudice. (ECF No. 50). Because the settlement resolved all of Wayman's claims against Jackson Creek, Perdue agrees that its claims for contribution as a joint tortfeasor are barred by the Supreme Court's decision in McDermott, Inc. v. AmClyde, 511 U.S. 202, 207-09 (1994). In McDermott, the Court clarified that claims for contribution could not proceed against a settling joint tortfeasor because the proportionate share rule of maritime liability ensured that each party would only be held liable for its proportionate share of the harm. Id. at 209. Thus, Jackson Creek's settlement is presumed to have compensated Wayman for all of the injuries resulting from Jackson Creek's negligence. Id. at 221. Although Perdue concedes that

McDermott bars its claim for contribution, the company argues that disputes of material fact preclude summary judgment on its indemnity counts.

Much of the briefing by both sides is devoted to issues of fact related to Wayman's decision to board the caisson directly from the tug, and evidence that Jackson Creek knew the caisson was in poor condition. As set forth above, accepting the facts in the light most favorable to Perdue, the summary judgment record reflects that Wayman boarded without wearing a PFD and directly from the bow of the tug instead of utilizing the aluminum gangway. Though sharply contested, there is also sufficient evidence to suggest that the tug's owner, Jay Ward, may have known the Perdue facilities and the caisson were in poor condition.[3] But as set forth in detail below, these disputes are insufficient to create a triable issue on the indemnity claims because Wayman is not seeking to hold Perdue liable for Jackson Creek's negligence, and no theory asserted against them would render them liable as a matter of strict liability. As a result, a verdict in favor of Wayman against Perdue will necessarily be based on the company's proportionate fault, and not on harm caused by the settling Defendant, Jackson Creek.

## II. STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 requires the Court to grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322-24 (1986). "A material fact is one 'that might affect the outcome of the suit under the governing law.' A disputed fact presents a genuine issue 'if the evidence is

---

[3] By separate Order, the court has addressed witness testimony suggesting Jackson Creek's owner had been told by one of his employees that the caisson was a "ticking time bomb." (ECF No. 55-1, at 9-10). Although Ward himself did not testify to such knowledge, it was attributed to him by Wayman's spouse, who later retracted it in a conflicting affidavit. Kelly Wayman Aff. (ECF No. 46-5). However, for purposes of summary judgment, this Report assumes the summary judgment record is sufficient for a reasonable juror to conclude that Jackson Creek was charged with at least some knowledge that the caisson was in poor condition. Because Jackson Creek's negligence on this point is ultimately unrelated to the crossclaims for indemnity, this Report concludes that fact is not material to Perdue's motion for summary judgment.

5

such that a reasonable jury could return a verdict for the non-moving party.'" Spriggs v. Diamond Auto Glass, 242 F.3d 179, 183 (4th Cir. 2001) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). If there is no genuine issue as to any material fact, "[t]he moving party is 'entitled to a judgment as a matter of law' because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." Celotex Corp., 477 U.S. at 323.

The party seeking summary judgment has the initial burden of informing the Court of the basis of its motion and identifying materials in the record it believes demonstrates the absence of a genuine dispute of material fact. Fed. R. Civ. P. 56(c); Celotex Corp., 477 U.S. at 322-25. When the moving party has met its burden to show that the evidence is insufficient to support the nonmoving party's case, the burden shifts to the nonmoving party to present specific facts demonstrating that there is a genuine issue for trial. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986).

In considering a motion for summary judgment, "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000); see Anderson, 477 U.S. at 255. "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 249.

### III. ANALYSIS

The parties agree that Perdue's contribution claims are barred by the Supreme Court's adoption of the proportionate share model of apportioning liability to settling joint tortfeasors. McDermott, 511 U.S. at 209. And much of Perdue's other briefing involves contested facts

6

related to Perdue's alleged negligence. However, because the duties allegedly breached by Jackson Creek run to Wayman himself, his claim for damages related to them are released by the settlement. Wayman has not alleged any theory which would expose Perdue to liability for Jackson Creek's negligence. And because Perdue has not asserted any direct claims against Jackson Creek, the two are "merely joint tortfeasors" and Wayman's settlement is sufficient to preclude liability between them.

A. **McDermott bars all claims against settling joint tortfeasors.**

Although it did not involve personal injury, the facts of McDermott are sufficiently important to review in detail. The case involved damage caused by a crane failure during the relocation of an oil and gas platform. McDermott, 511 U.S. at 205-06. The crane was owned by McDermott, and manufactured by AmClyde. The accident happened when a hook and sling failed causing the crane to fall, damaging it and the platform. According to the opinion, the failure may have been caused by McDermott's "negligent operation of the crane, by AmClyde's faulty design . . . by a defect in the hook supplied by River Don, or by one or more of three companies that supplied" the lifting slings. Id. at 205. McDermott brought suit against AmClyde, the hook manufacturer, River Don Castings, and the sling defendants, but settled with the sling defendants prior to trial for $1 million. At trial, the jury assessed damages of $2.1 million, and in answer to special interrogatories fixed the parties' proportionate liability at 37% to AmClyde, 38% to River Don, and 30% jointly to McDermott and the sling defendants. Id. at 206. On appeal, the Supreme Court had to determine how to allocate credit for the $1 million settlement, which was substantially more than the proportionate share of the verdict assigned to the settling defendants at trial.

After examining three different theories of apportioning liability to settling defendants which were then recognized by the Restatement (Second) of Torts, the Court adopted the "proportionate share model." As framed by the Restatement, this rule provides that in cases of joint liability the amount paid by the settling defendant "extinguishes any claim that the injured party has against the released tortfeasor and also diminishes the claim that the injured party has against the other (non-settling) tortfeasors by the amount of the equitable share of the obligations of the released tortfeasor." Id. at 209 (quoting Restatement (Second) of Torts § 886A, pp. 343-44 (1977)). Thus, on the facts before it, the Court held that the settling defendants' $1 million payment extinguished all claims McDermott had against the settling sling defendants, but also diminished McDermott's recovery by the proportionate share of liability assigned to them – 30%.

In choosing among the three competing theories for allocating settlement proceeds, the Court primarily focused on three factors: (1) consistency with the proportionate fault approach to maritime liability adopted in United States v. Reliable Transfer, 421 U.S. 397 (1975); (2) promotion of settlement; and (3) judicial economy. Id. at 211. The Court recognized that no model was perfect because allocating credit for a settlement negotiated before liability was determined necessarily involved balancing the risk of overcompensating plaintiffs against the risk that non-settling defendants might receive a windfall if the settling defendant was ultimately responsible for a larger share of proportionate fault. The Court concluded, however, that the proportionate share approach struck the best balance because the non-settling defendants would pay no more than their fair share of the loss. And if the plaintiff's recovery is diminished because he accepted too little from the settling defendant, it is a risk he voluntarily assumed.

No claims for contribution are permitted under McDermott because none are necessary. Id. at 209. Non-settling defendants are not punished for going to trial, because the jury (or judge) can still assess the proportionate fault attributable to the settling defendants. And the defendants proceeding to trial can "argue the 'empty chair' in hopes of convincing the jury that the settling party was exclusively responsible for the damage." Id. at 217. The Court recognized that this rule may result in a plaintiff being overcompensated after negotiating a favorable settlement which exceeded the value of the settling defendants' eventual share, but concluded that the plaintiff retaining these benefits was more equitable than the alternatives, noting that the settling plaintiff takes on the risk of his settlement by proportionately limiting his recovery against the other defendants who were not parties to the settlement. As a result, the non-settling defendants have no claim to settlement proceeds in excess of the settling defendants' proportionate share. But neither are they required to assume disproportionate liability when the plaintiff's settlement falls below the share of liability allocated to the settling tortfeasor. Id. at 221.

In this case, as in McDermott, Jackson Creek and Perdue are joint tortfeasors. Wayman alleged that both were responsible for failing to guard against the collapse of the mooring caisson which caused his injuries. While Perdue argues that Jackson Creek is the more culpable party, based on Captain Bohanon's instructions to Wayman, his decision to board the caisson directly from the tug without using the gangway, and his failure to wear a PFD, nothing precludes the company from defending Wayman's claims on these grounds at trial. And if the evidence reveals that Jackson Creek had superior knowledge of the caisson's condition, the court can apportion its fault accordingly. Indeed, under McDermott, Perdue can – and likely will – argue the "empty chair," asserting that Jackson Creek was 100% at fault for Wayman's injuries. If the

9

company succeeds and the settlement proceeds are insufficient to compensate Wayman for his losses, under <u>McDermott</u>, he bears the risk of negotiating an insufficient settlement for his release of the joint tortfeasor.

**B.   Perdue cannot be held liable for Jackson Creek's negligence on the claims Wayman asserted.**

Recognizing that <u>McDermott</u> bars contribution claims, Perdue agrees that its Count III is barred, but argues that the proportionate fault rule does not bar claims for indemnity. <u>Boykin v. China Steel Corp.</u>, 73 F.3d 539 (1996). While this is a correct statement of law in the Fourth Circuit, it ignores the specific claims Wayman has asserted against Perdue, and the broad scope of the contribution bar under <u>McDermott</u>.

The case Perdue relies upon, <u>Boykin v. China Steel Corp.</u>, involved an onboard explosion which killed four crewmembers. The explosion was caused by methane gas from a cargo of coal owned by China Steel Corp. <u>Id.</u> at 540-41. The crewmembers' estates sued the ship owner, Bergeson, as well as China Steel and the coal supplier, U.S. Steel Co. The defendants all filed crossclaims for indemnity, and Bergeson also filed claims against the cargo owner and supplier for the damage to its vessel. Prior to trial, Bergeson settled with the estates of its crewmembers and the case proceeded to trial against the coal defendants. At trial, the court determined that the cargo owner and supplier were 100% at fault for having mislabeled the coal, loading a much more volatile variety than they represented, which resulted in the accumulated methane gas and explosion. <u>Id.</u> at 541. After trial, the ship owner, Bergeson, sought to recover on its indemnity claims and the district court granted judgment on both contractual and common law indemnity theories. The coal defendants appealed, arguing that the indemnity claims were barred by <u>McDermott</u> because the parties were joint tortfeasors. The Fourth Circuit disagreed, first noting that the cargo owner had entered into a written Indemnity Agreement with Bergeson which

would not be modified by McDermott in any event. The court went on to hold, however, that Bergeson could also recover under its implied indemnity claim because Bergeson's liability to the decedents "was not merely that of a joint tortfeasor, it was liability without fault attaching to an unseaworthy ship." Id. at 544. Importantly, the unseaworthy condition of Bergeson's vessel was caused by the non-settling defendants' mislabeling of coal. As a result, McDermott did not bar indemnity claims by the settling defendant, when that defendant was required to pay due to strict liability. Noting that Bergeson had tendered the defense of the claims to the coal-supplying defendants, the court held that, in rejecting it, they assumed the risk of defense; part of which was indemnifying Bergeson, which had been forced to settle due to the unseaworthy condition of its vessel caused by the dangerous cargo.

The Fourth Circuit noted the similarity to a Fifth Circuit opinion which also involved indemnity claims by a settling defendant facing strict liability. That case, Bertram v. Freeport McMoran, Inc., 35 F.3d 1008 (5th Cir. 1994), involved strict liability claims for maintenance and cure by employees on a drilling rig in the Gulf of Mexico. After a trial in which the settling employer was found not at fault, the Fifth Circuit affirmed the trial court's decision to order reimbursement of the settlement by the at-fault tortfeasors, noting that the employer "was not a joint tortfeasor with the contractor and the platform owner and that its liability for maintenance and cure was regardless of whether or not it was negligent." Boykin, 73 F.3d at 544 (citing Bertram, 35 F.3d at 1019). Thus, both Bertram and Boykin stand for the proposition that McDermott's proportionate fault rule does not bar indemnity claims by a settling defendant when that defendant is facing strict liability, and the possibility of being found liable for the negligent acts of a non-settling codefendant.

In this case, however, Perdue is not facing strict liability. The causes of action asserted against it by Wayman are purely negligence claims. State Compl. ¶¶ 15-16 (ECF No. 1-1); Wayman Crossclaim 14-18 (ECF No. 22). Perdue did not employ Wayman, nor did it have anything to do with the maintenance of the JACQUELINE A. And Wayman's claims allege only liability for Perdue's own failure to exercise ordinary care. As a result, there is no possibility that Perdue would have liability to compensate Wayman for the negligent acts of Jackson Creek.

In addition, Perdue has not asserted any claims against Jackson Creek for damage to its property or for any direct damages as a result of the negligence it describes. For example, Perdue did not seek to hold Jackson Creek liable for rebuilding the caisson, or for the cost of its removal and cleanup. All of its claims relate exclusively to indemnity "in the event that Perdue is found liable for the injuries allegedly sustained by Wayman." Perdue Claim and Answer ¶¶ 16, 21 (ECF No. 18). And the duties it alleges that Jackson Creek breached are duties flowing from Jackson Creek to Wayman, and not to Perdue. For example, the claim alleges that Jackson Creek failed to properly train and supervise Wayman on the proper way to retrieve the line from the mooring caisson. It also alleges that the company failed to equip him with proper safety equipment, including presumably a PFD. Finally, it alleges the company failed to use caution when maneuvering in the vicinity of the mooring caisson which it claims Jackson Creek knew to "be allegedly unsteady." Id. at ¶¶ 14(a)–(d). After reviewing the video, it is doubtful any of this contributed to the collapse of an 80-ton concrete and steel caisson under the weight of a 150 pound crewmember.[4] But even if it did, Wayman must look to Jackson Creek for compensation. And having negotiated an agreed release of these claims, he may no longer seek to hold Perdue liable to the extent his employer's breach of duty caused him harm.

---

[4] Van Hemmen Report (ECF No. 42-18, at 7) (noting estimated weight of the concrete and steel mooring caisson).

In its summary judgment briefing, Perdue vigorously argues that disputes of fact preclude granting summary judgment, but the company has not rebutted Jackson Creek's legal argument that, in settling with Wayman, these claims are extinguished because the settlement not only resolved Wayman's claims against Jackson Creek, but also diminished the claim that Wayman has against Perdue "by the amount of the equitable share of the obligation of [Jackson Creek] the released tortfeasor." McDermott, 511 U.S. at 209 (quoting Restatement (Second) of Torts Section 886A, p. 344 (1977)). Perdue has not identified any claim by Wayman against it which cannot be fairly litigated under the proportionate fault rules established by Reliable Transfer, and the contribution bar articulated in McDermott. The company may establish that Wayman's injuries were caused by Jackson Creek's negligence. But if it does, the proportionate allocation of that liability will prevent Perdue from shouldering a disproportionate burden. And if the settlement negotiated by Wayman with Jackson Creek is insufficient to fully compensate him, the shortfall is his to bear. McDermott, 511 U.S. at 221.

C. **Perdue has not demonstrated a material issue for trial on either of its indemnity counts.**

Neither of Perdue's indemnity counts is premised upon a written contract of indemnity. See Boykin, 73 F.3d at 542. Indeed, the only written agreement between Perdue and Jackson Creek is a one-page Towing Agreement which expressly recites that: "The parties are independent contractors. Each shall be fully responsible for its own activities under this Agreement." Mem. in Opp. Mot. Summ. J., Ex. C (ECF No. 42-3). Although Jackson Creek argues this contract languages expressly disclaims implied warranties, it does not go that far. See Little Beaver Ent. v. Humphries Ry., Inc., 719 F.2d 75, 78 (4th Cir. 1983) (limitations on the warranty of workmanlike service are disfavored and strictly construed). But it is evidence that neither company is expressly contractually bound to indemnify the other.

13

Perdue's theories of indemnity depend upon the implied warranty of workmanlike performance associated with the towing operation itself, and the broader common law theory of maritime tort indemnity. Both of these implied-in-law remedies protect litigants damaged or forced to answer claims for damage as a result of others' fault. Wayman asserts no such claims against Perdue. As a result, following settlement and the contribution limits imposed by the proportionate fault rule, neither of these claims is sufficient to survive summary judgment.

    i.    **Any breach of the duty of implied warranty of workmanlike performance would not give rise to a damage claim in favor of Wayman against Perdue.**

A contract of towage may give rise to an implied warranty of workmanlike service. Tebbs v. Baker-Whiteley Towing Co., 407 F.2d 1055, 1058 (4th Cir. 1969), but see Cargill, Inc. v. C&P Towing Co., 1991 AMC 392 (4th Cir. 1991) (unpublished) (distinguishing Tebbs, and holding that implied warranty does not apply in ordinary towage contracts "at least not in the absence of negligence."). When it exists, the implied warranty generally runs in favor of the owner of the towed vessel, and arises because the owner "turns his vessel over to the control of the tug owner and relies on the latter's expertise in conducting safe towing operations." Tebb's, 407 F.2d at 1059; see also In re: McAllister Towing of Virginia, Inc., 2000 AMC 2164, 2169 – 2172 (E.D. Va. July 11, 2000). The implied warranty does not render the tug owner an insurer of the vessel, and the breadth of the warranty depends "on the circumstances of the case relating to control, supervision, and expertise." Tebbs, 407 F.2d at 1059.

Here, assuming without deciding that an implied warranty existed concerning Jackson Creek's execution of the tow, that warranty would ordinarily protect the owner of the towed vessel, not the terminal where the vessel was delivered. It is undisputed that the grain barge being delivered was owned by Dann Marine, a nonparty. The barge itself was not damaged, and Wayman has not asserted any claims against the barge or Dann Marine. Moreover, even if the

14

implied warranty of workmanlike service in executing the tow did extend to the terminal operator, it would not create a right of indemnity for the claims asserted by Wayman against Perdue. Again, Perdue has not asserted any direct claims against Jackson Creek. It does not seek compensation for damage to its facility, the costs of cleanup, nor for financial losses associated with repairs to its facility. It only seeks indemnity in the event that it is held liable to Wayman. But as set forth elsewhere, Wayman's claims against Perdue are based on the company's failure to maintain its mooring facilities, and failing to discover their defective condition and warn Wayman and others prior to the caisson's collapse. These are not strict liability duties and Wayman will have to prove Perdue's negligence in order to recover. In addition, the duties that Perdue alleges Jackson Creek breached, including failing to train and properly equip Wayman and placing him aboard the caisson despite alleged notice of its defective condition, are duties owed from Jackson Creek to Wayman, not Perdue. Any damage Wayman sustained from the breach of these duties was settled against Jackson Creek and his recovery against Perdue will be diminished proportionately. McDermott, 511 U.S. at 209.

To recover against Perdue, Wayman will have to prove at trial that the company's negligence in failing to maintain the caisson contributed to its collapse when Wayman stepped onto it to retrieve the line. To the extent Perdue claims the implied warranty extends to require Jackson Creek to discover and report the deteriorating condition of the mooring caisson, such claims would be outside of the scope of a warranty implied by law to a towing operator. Indeed, such a ruling would be expressly contrary to the purpose of the rule – shifting responsibility away from, rather than towards the party with "superior control, supervision and expertise." Tebbs, 407 F.2d at 1059.

### ii. No indemnitor/indemnitee relationship existed between Perdue and Jackson Creek.

Finally, Perdue has not established facts sufficient to create an issue for trial on the elements of tort indemnity. Tort indemnity is recognized in maritime law. In the Fourth Circuit, the party seeking indemnity must establish four elements. First, it must show "an indemnitor/indemnitee relationship existed between itself and the proposed indemnitor." Vaughn v. Farrell Lines, Inc., 937 F.2d 953, 956 (4th Cir. 1991). Second, the indemnitee must demonstrate that it was compelled to satisfy the claim of the original plaintiff. Id. (citing Glover v. Johns-Manville Corp., 662 F.2d 225, 229-30 (4th Cir. 1981). Third, the settlement in the underlying action must be reasonable. And finally, the indemnitee must show that the unlawful action of the indemnitor proximately caused injury to the original plaintiff. Id. at 957. In the context of this case, Perdue, seeking indemnity from Jackson Creek, would first have to show an indemnitor/indemnitee relationship exists between the two. The facts in the summary judgment record fail to establish this element on which Perdue bears the burden of proof. As the Fourth Circuit held in Vaughn, the theory of implied indemnity is recognized in admiralty. Id. (citing White v. Johns-Manville Corp., 662 F.2d 243, 249 (4th Cir. 1981). It is premised upon "a principal of restitution to the situation where one person discharges liability that has been imposed on him by operation of law, but which should have been discharged by another." Id. (emphasis added).

The prototypical fact pattern for implied tort indemnity involves claims of strict liability, such as admiralty claims of unseaworthiness, or maintenance and cure when a ship owner or employer seeks indemnity from a third party whose negligence caused the unsafe condition resulting in injury to a seaman. White, 662 F.2d at 249 (ship owner held liable for unseaworthiness); Glover, 662 F.2d at 225 (same); Boykin, 73 F.2d at 544 (sustaining ship

16

owner's indemnity claims against owner and supplier of dangerous cargo which rendered ship unseaworthy). In such circumstances, where the indemnitee's liability is "merely constructive, vicarious, or derivative, the burden for the entire loss may be shifted to the indemnitor whose actual fault caused the injury." White, 662 F.2d at 249 (citing Restatement (Second) of Torts § 886B).[5] In this case, Perdue does not face strict liability on Wayman's claims nor vicarious liability imposed by operation of law. And it is only seeking indemnity "in the event that" it is held liable to Wayman on his original claims. Because those claims sound exclusively in negligence and allege only breaches by Purdue of duties it separately owed to Wayman, if Wayman recovers a verdict against Perdue, it will be because of Perdue's separate negligence in failing to maintain the caisson and not as a result of any negligence by Jackson Creek. Ordinarily, "when a party seeking indemnification was itself guilty of acts or omissions proximately causing the plaintiff's injury, tort indemnity is inappropriate." Wedlock v. Gulf Mississippi Marine Corp., 554 F.2d 240, 243 (5th Cir. 1977); Araujo v. Woods Hole, 693 F.2d 1, 3 (1st Cir. 1982). As a result, Perdue has not established an indemnitor/indemnitee relationship with respect to Wayman's claims. Maritime Overseas Corp. v. Northeast Petroleum Indus., Inc., 706 F.2d 349, 351-52 (1st Cir. 1983) (denying tort indemnity to ship owner where verdict in favor of seaman demonstrated ship owner's minimal negligence).

## IV. RECOMMENDATION

For the foregoing reasons the undersigned recommends the court GRANT Jackson Creek's Motion for Summary Judgment (ECF No. 41), and DISMISS Perdue's crossclaims (ECF No. 18) against it with prejudice.

---

[5] As described in the current Restatement, tort indemnity arises when the indemnitee is "not liable except vicariously for the tort of the indemnitor." Restatement (Third) of Torts, § 22(a)(2)(i) (2000).

## V. REVIEW PROCEDURE

By copy of this report and recommendation, the parties are notified that pursuant to 28 U.S.C. § 636(b)(1)(C):

1. Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within fourteen (14) days from the date of mailing of this report to the objecting party, see 28 U.S.C. § 636(b)(1), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure. Rule 6(d) of the Federal Rules of Civil Procedure permits an extra three (3) days, if service occurs by mail. A party may respond to any other party's objections within fourteen (14) days after being served with a copy thereof. See Fed. R. Civ. P. 72(b)(2) (also computed pursuant to Rule 6(a) and (d) of the Federal Rules of Civil Procedure).

2. A district judge shall make a de novo determination of those portions of this report or specified findings or recommendations to which objection is made.

The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in a waiver of appeal from a judgment of this Court based on such findings and recommendations. Thomas v. Arn, 474 U.S. 140 (1985); Carr v. Hutto, 737 F.2d 433 (4th Cir. 1984); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984).

/s/
Douglas E. Miller
United States Magistrate Judge

DOUGLAS E. MILLER
UNITED STATES MAGISTRATE JUDGE

Norfolk, Virginia

April 21, 2017

18